DELL ROSS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ross v. Commissioner
Docket No. 3561-71.
United States Tax Court
T.C. Memo 1974-221; 1974 Tax Ct. Memo LEXIS 98; 33 T.C.M. (CCH) 982; T.C.M. (RIA) 74221; August 27, 1974, Filed. Lawrence S. Wayne and Ben Gould, for the petitioner. Richard R. Harrington, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: Respondent determined a deficiency in petitioner's income tax in the amount of $6,011.33 for the taxable year 1967. The sole issue presented is whether petitioner was a bona fide resident of Mexico during the entire taxable year for purposes of the exclusion provided by section 911(a) (1) of the Internal Revenue Code of 1954. [1]
*99 FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and exhibits are incorporated by reference. Petitioner resided in Los Angeles, California, when she filed her petition. Her Federal income tax return for the taxable year 1967 was filed with the Western Service Center at Ogden, Utah, on May 22, 1968. Petitioner is not married. Petitioner graduated from college in 1945 with a major in business administration. While in college, she studied Spanish and later took a Spanish shorthand course while working in an export-import business in New York City. During the course of this job, she occasionally utilized Spanish in speaking and in correspondence. During the 1950's, petitioner moved to California and became a secretary in the motion picture industry. In 1958 she became a script supervisor and has been continuously employed in that capacity. As a script supervisor, she must be present at the filming of all scenes in a production to take notes of all factors which may be involved in a scene, such as the actors' hair, wardrobe, direction in which they are facing, and the mood of the scene. The script supervisor ensures that continuity is *100 maintained while filming television or movie scenes. One of petitioner's original reasons for becoming a script supervisor was her belief that she could thereby obtain employment throughout the world. In 1962, without knowledge of the Italian language, she traveled to Italy seeking employment as a script supervisor with Italian movie producers. She was unsuccessful in obtaining employment there and returned to the United States. When she left for Italy, she leased her single family residence and continued to lease the house after the taxable year 1967. After completing work on a long series of films with Paramount Pictures in 1966, petitioner inquired about employment with Banner Productions. She was interviewed in the middle of December 1966 by Miss Margaret Jennings, the producer's executive assistant. Miss Jennings informed petitioner that Banner needed a script supervisor for the "Tarzan" episodes which they were filming in Mexico pursuant to a contract with the National Broadcasting Co. Miss Jennings explained that she needed someone who could speak Spanish because Banner employed a Mexican film crew. In addition, Banner required the script supervisor to give assurances *101 that he or she would remain in Mexico as long as required to do so. She stated to petitioner that March 1967 was a "pickup date" for the series at which time NBC could exercise its annual option to terminate the series. [2] Miss Jennings expected the series to continue for three or four years. Petitioner was not informed as to the length of her employment or the term of the NBC contract. Two theatrical features of "Tarzan" had been produced in 1965 by Banner in Brazil. Banner also produced three television episodes in that country for NBC in 1965 and three episodes in 1966. In 1966, the production company for "Tarzan" was moved to Mexico. The episodes began to appear on television in September 1966 on a weekly basis during prime viewing time. From the onset of its telecasting and throughout 1967, "Tarzan" was rated in the top 20 to 25 of the 100 rated television *102 programs by the television trade papers. Approximately 62 episodes of "Tarzan," requiring 8 to 10 days per episode for filming, were produced by Banner in Mexico during the years 1966 and 1967. After assuring Miss Jennings that she had no family ties in the United States, and that she would make arrangements with respect to the apartment where she resided, Banner offered petitioner the job in Mexico. She accepted without hesitation because she was delighted about the prospect of leaving the country as she would earn more and would have the "opportunity to start a new life." She also knew that the "Tarzan" show was a popular series. Upon leaving Miss Jennings' office, petitioner was introduced to some of the people she would be working with in Mexico. One was a director who told her that she would be doing a "Hannibal" pilot episode which could take from two weeks to two months to produce. However, it had not yet been decided whether the "Tarzan" production was to cease production temporarily so that the pilot could be filmed or whether "Hannibal" would use another crew. In addition, the "Hannibal" script and casting had not been completed. Petitioner was given a roundtrip *103 ticket to Mexico by Banner and allowed 10 days to travel there. On December 10, 1966, she applied for a passport. On the application form she represented that her proposed length of stay was to be from 3 months to 1 year. In doing so, it was her intent to make a reasonable estimate of the length of her stay in Mexcio. She also indicated by checking an appropriate box that she expected to take another trip abroad within 2 years. Prior to leaving Los Angeles, petitioner sublet her apartment for $50 a month to a close friend. Her rent was $89.50 per month for the apartment and she rented it to him for $50 per month so that he would take care of the apartment and protect her furniture. She did not want to lose the apartment because she considered it to be a bargain. She deducted the difference of $39.50 per month as a loss during the taxable year 1967. Petitioner arrived in Mexico prior to December 25, 1966. She attended parties and met everyone who worked for Banner. Her work on the "Tarzan" episodes was commenced in Mexico City during the last week of December 1966. She did not work on the "Hannibal" pilot which was later filmed in Mexico by a separate Banner crew. The *104 production of "Tarzan" continued in Mexico City, then in Cuernavaca for 2 to 3 months before moving to Guadalajara in June 1967. During June, July and August, production was suspended. In September 1967 filming was resumed in Guadalajara until moving to Acapulco in November 1967, where filming continued until the end of the year. When petitioner first arrived in Mexico City, she resided in a hotel. After living there only a few weeks, she moved into an apartment house under a 3-month lease in a primarily Mexican neighborhood. She had a telephone installed and cooked her meals in the apartment. In Mexico City she attended a jazz class for physical exercises in a bicultural school for Mexicans and Americans, in order to meet people. The class had art exhibits and she purchased paintings there and made friends with the Mexicans. She also visited art galleries and attended concerts. She purchased clothes, visited the homes of Mexicans employed by Banner, and joined a tennis club. In February 1967 petitioner decided that she would need her car in Mexico and had the car transported there from Los Angeles. She obtained a bond of $150 to bring the car into Mexico. She retained *105 her California license plates and driver's license since her Mexican co-workers advised her that California license plates were acceptable but she canceled her American automobile insurance and obtained Mexican coverage. In Cuernavaca, petitioner resided in a residential hotel. During the summer production hiatus, she lived in Mexico City. Prior to the resumption of filming in August 1967, she obtained an expensive condominium apartment in Guadalajara. When the production crew moved to Acapulco, she stayed in a hotel for 1 month and then moved to an apartment. She traveled to Guatemala for 2 weeks during 1967 to film 2 "Tarzan" episodes, and flew to New York City when her father underwent surgery. Petitioner's salary checks were issued from Los Angeles and deposited by Banner into her Los Angeles checking account. Her tenant deposited the rental payments in her checking account, and she used the account to pay the expenses attributable to her rental house in Los Angeles. She was paid a per diem allowance in Mexican pesos. She was able to save money by living in an apartment and cooking her meals. When necessary, she would borrow money from a co-worker and reimburse him by *106 check.
Petitioner inquired at the United States consulate in Mexico about her Federal income tax liability, and she was informed that she must reside in Mexico for 18 months in order to exclude her income from taxation but she could be considered a bona fide resident if she remained in Mexico for a calendar year. She made no inquiry about her tax liability to the Mexican government, and she never paid taxes to the Mexican government. During July, when filming ceased, petitioner wrote to the production manager of Warner Brothers, and sought employment in his production of "Evil Gun," the filming of which was to commence in Mexico. She explained to him that she enjoyed the Mexicans, worked well with them, and desired to remain in Mexico to work on his feature film. Prior to her departure for Mexico, petitioner renewed her Beverly Hills Health Club membership by paying all but $62 of her membership fee in advance. In November 1967, she wrote to M & M Finance Co. of Los Angeles with respect to the membership fee as follows: Gentlemen: The television company I am with is constantly on the move throughout Mexico - it has been this way for all of this year. Naturally, something *107 was bound to give, as regards my commitments [sic] in the States and, I'm afraid, the Beverly Hills Health Club was it!
As I recall, I did not quite use three months of my contract before leaving the country and paid three-quarters of the contract price. The owner very kindly offered to let me avail myself of the balance of the contract time upon my return to the States this year. At least, I think this is what he meant, on the condition, of course, that I pay the balance of the contract price. I am not returning to the States this year. In fact, I am not sure when I am coming back. However, I do love the Club and would like to use its facilities when I do return - whether it be in '69 or whenever. If, therefore, you will let me have some written assurance that I can avail myself of the remaining 9 months or whatever of my contract when I return to Los Angeles, I will most happily send you my check for the balance due. We are moving to Acapulco shortly and as I do not have an address there as yet, kindly communicate with me as follows: Dell Ross c/o Lamar Criss Pachuca 75 Apt. 701 Col. Condesa Mexico D.F. 11 Same will be forwarded to me in Acapulco. Very *108 truly yours, Dell Ross She received no response from the finance company nor the health club, and she never paid the balance on her membership. On January 1, 1968, petitioner's position with Banner was terminated due to a personality clash with a director. Later, in March 1968, NBC exercised its option to cancel the "Tarzan" series. The series had not declined in popularity but the sponsors were dissatisfied with its audience appeal. She sought other employment in Mexico from producers whose names were furnished by the Banner location auditor. A producer interviewed her, offered her a job on two pictures which were to be produced in February 1968, and gave her a script to read in preparation for the filming. She read the script, but the films were never produced due to lack of financing. Petitioner contacted Warner Brothers about working on a feature film entitled "The Wild Bunch" which was to be filmed in Mexico. Petitioner decided to live in Mexico City and she rented a small apartment which was available in February when the former tenant moved out. During January she purchased furniture for the apartment. She contemplated leaving her furniture in the apartment while *109 she worked on location. She arranged for the store where she purchased the furniture to make delivery after she provided it with the address of her new apartment. On the bill of sale, she indicated that her "domicillo" or permanent address was 8218 1/2 West Norton, Los Angeles 46, Calif.
While waiting for Warner Brothers to commence production of "The Wild Bunch," petitioner decided to work on her own film script depicting an American girl falling in love with a Mexican in a fishing village. She obtained information about the customs of fishing villages from a Mexican friend and departed for Guaymas to study the locale as a shooting location for her script and to vacation. En route to Guaymas on February 13, 1968, she was injured in an automobile accident. Petitioner returned to the United States on April 5, 1968, for surgery necessitated by her injury in the automobile accident. On her income tax return for the taxable year 1967, petitioner excluded $20,000 from her gross income. On Form 2555 (Statement to Support Exemption of Income Earned Abroad) attached to her return, petitioner inserted the following information as to contractual terms or conditions affecting the length *110 of her employment: Indefinate [sic] period of time. Originally to do a Hanibal [sic] pilot for Banner Prod., then Tarzan series and other work as obtained. Negotiated for other jobs until end of residence in 1968. In his statutory notice of deficiency respondent disallowed the exclusion claimed by petitioner. OPINION The sole issue presented for our decision is whether petitioner was a bona fide resident of Mexico during the entire taxable year 1967 for purposes of section 911(a) (1). [3] The question is factual and each case is decided on its own circumstances. Donald H. Nelson, 30 T.C. 1151 (1958). *111 A taxpayer need not be domiciled in a foreign country to qualify as a resident. Commissioner v. Swent, 155 F.2d 513, 515 (C.A. 4, 1946); Herman Frederick Baehre, 15 T.C. 236, 241 (1950). By the same token, however, mere presence of an individual in a foreign country does not, of itself, constitute residence. Downs v. Commissioner, 166 F.2d 504, 508 (C.A. 9, 1948), certiorari denied 334 U.S. 832 (1948). Yet the individual is not required to intend to remain in the country permanently in order to be considered a resident. Cf. Lois Kaiser Stierhout, 24 T.C. 483, 487 (1955), and Scott v. United States, 432 F.2d 1388, 1396 (Ct. Cl. 1970). Section 1.911-1(a) (2), Income Tax Regs., provides that the question of bona fide residence in a foreign country for purposes of exclusion of income shall be determined, to the extent feasible, by section 871 and the regulations thereunder. Section 1.871-2(b), *112 [4] Income Tax Regs., provides that the question of whether or not a taxpayer is a "transient" or "sojourner" as opposed to a resident is to be determined by "his intentions with regard to the length and nature of his stay." The intent of the taxpayer is of paramount importance. Donald F. Dawson, 59 T.C. 264, 268 (1972). Eleven criteria were set forth for examining the question of residency in Sochurek v. Commissioner, 300 F.2d 34, 38 (C.A. 7, 1962).[5]
*113 We have thoroughly examined the record in light of the principles set forth in the regulations and case law and we conclude that petitioner was a bona fide resident of Mexico throughout the taxable year 1967. Respondent argues that the statements made by petitioner on her passport application and on her income tax return conclusively prove that she intended to remain in Mexico for only a few months. We think otherwise. Petitioner explained her reason for writing "3 months - 1 year" on the passport application. She testified that she intended thereby to make "as reasonable an estimate as possible" without knowing exactly how long her employment would last. Her statement was motivated not by her intention to remain for a short while but by her possible pessimism or "modesty," to use her expression, that the production of the "Tarzan" series might not continue beyond a year, or even that she might be replaced on the series. With respect to petitioner's answers on her income tax return, respondent contends that they prove she had the intention of going to Mexico for the limited purpose of making the "Hannibal" pilot and then immediately returning to the United States. Petitioner *114 may have been led to believe by a Banner director that she would work on the pilot. Nevertheless, the record shows that she was hired primarily to work on the "Tarzan" series and knew this before she left the United States. Her statement on the tax return simply manifested an original impression that she might work on "Hannibal" before commencing work on "Tarzan." While the regulations under section 871 may not necessarily deny residency status to a taxpayer who has the intent to remain in a foreign country for a lengthy but definite period of time, they clearly contemplate that an individual living in the country who "has no definite intention as to his stay" is considered a resident and that a "mere floating intention" to return to another country at some indefinite time in the future does not cause such person to be considered a transient. We are convinced that petitioner planned to remain in Mexico indefinitely and she would remain as long as she was employed there. Of course, we recognize that she intended to return to the United States eventually but she did not travel to Mexico *115 for a specific purpose which could be promptly accomplished. Lois Kaiser Stierhout, supra at 487. Petitioner was employed for the "Tarzan" series upon making explicit assurances to Miss Jennings that she would be both willing and able to remain in Mexico indefinitely. Based upon the show's top ratings, it was a reasonable expectation of both Banner and petitioner that "Tarzan" would in fact be produced for a number of years. Although subject to termination, the agreement between NBC and Banner spanned 5 years, and the series was produced for 3 years before cancellation in 1968. There are additional reasons why we believe that petitioner did not travel to Mexico for a specific purpose which could be promptly achieved. Her correspondence with Warner Brothers during the summer hiatus indicates that she intended to stay in Mexico even if Banner did not commence production again or if her employment were terminated. She enjoyed working with the Mexican crews and desired to remain in Mexico. When her employment was terminated, she did not leave Mexico but, instead, sought jobs on feature motion picture films, read a script in preparation for the production of one *116 film, and commenced work on her own script. She also arranged to rent an apartment in Mexico City and purchased some furniture for the apartment. One may also conclude from the record that the primary reason, if not perhaps the only reason, she returned to the United States after residing in Mexico for a little more than 15-1/2 months was for surgery. We do not consider her letter of November 5, 1967, to M & M Finance Co. regarding her health club membership indicative of her intent to return to the United States during 1967. It is more likely that she told the owner of the club that she expected to return at that time in order to exact from him a promise that she could avail herself, upon her return to California, of the 9 months of membership which had been prepaid but not used. Had she informed him that she would remain in Mexico indefinitely, she might have received a negative response. In the letter, she indicated that she was unsure as to when she would return to the United States. Petitioner participated in the social and cultural activities of the city in which she worked to the extent that her work schedule permitted, and she lived for the most part in Mexican apartment *117 houses rather than in hotels. She spoke Spanish and had a telephone installed in her Mexico City apartment. She attended classes at the bicultural school in Mexico City where she formed friendships with Mexican students. She visited art galleries and attended concerts. Through her visits to the homes of Mexican friends and her grocery shopping, petitioner undoubtedly found a close identification with the Mexicans. She left Mexico for short periods of time to film a picture in Guatamala and to visit her father when he underwent surgery. She did not take the job in Mexico for the purposes of avoidance as she was unaware of the exclusion provisions at the time she left for Mexico. We regard her inquiry concerning United States tax liabilities at the American consulate as a legitimate request for tax advice. Respondent makes much of the fact that petitioner may have been skeptical about her trip to Mexico because of her experiences in Italy. We find little similarity between her Italian and Mexican experiences as a script supervisor. Petitioner had a great deal more experience when she flew to Mexico than she possessed in 1962, and she had a working knowledge of Spanish. *118 The only factors which we perceive as seriously weighing against petitioner's claim for exclusion are that she paid no income taxes to the government of Mexico and that her employer withheld taxes from the salary paid to her. The presence of these factors, viewed in light of the entire record, does not prove fatal to petitioner's case. Nowhere in section 911 is there a requirement that taxes be paid to a foreign government as a condition precedent to the permitted exclusion. Donald F. Dawson, 59 T.C. 264, 268 (1972); David E. Rose, 16 T.C. 232, 238 (1951). There is no evidence that petitioner submitted a statement to the Mexican authorities claiming that she was a nonresident of Mexico so as to come within section 911(c) (6). [6]
*119 With respect to Banner's withholding of taxes from her salary, it is doubtful that petitioner had any choice.
As respondent contends, we recognize that petitioner retained certain home ties. She owned a residence and retained a rented apartment in Los Angeles. She also maintained a bank checking account in a California bank, a driver's license, and automobile license plates. The retention of such ties is not inconsistent with maintaining a domicile in California to which she intended to eventually return. The house had been rented since 1962 and while petitioner resided in Mexico, her apartment was sublet to a close friend. We found her explanation for retaining the apartment plausible. She believed that it was less expensive to retain the apartment than to place her furniture in storage, and she did not want to surrender the apartment because the rent of $89.50 per month was a "tremendous bargain" in Los Angeles. She gave her friend a $39.50 discount in rent so that he would look after her furniture. This arrangement may not have been the most economical one she might have chosen, but it does not necessarily reflect an intent to remain in Mexico for only a short while. *120 Nowhere does the record indicate that it was a temporary arrangement. With respect to the other ties to California, we find adequate reason. The California checking account was used by petitioner for receiving her rental income and paying the expenses attributable to her house. She was living on her per diem allowance; therefore, there was no reason for opening a checking account in Mexico. Her California driver's license and plates were maintained by her after her Mexican co-workers assured her that they were acceptable to the Mexican authorities. We conclude that petitioner was a bona fide resident of Mexico for 1967 and is entitled to exclude $20,000 from income for that year under the provisions of section 911. Decision will be entered for the petitioner. Footnotes
1. All statutory references are to the provisions of the Internal Revenue Code of 1954 in effect during the taxable year in issue unless otherwise indicated. ↩
2. By contract between Banner and NBC dated September 13, 1965, which remained unexecuted by the parties by reason of business custom, NBC was given four annual consecutive options exercisable on March 15 of the year to discontinue the "Tarzan" series after the first broadcasting year commencing in September-October. ↩
3. SEC. 911. EARNED INCOME FROM SOURCES WITHOUT THE UNITED STATES. (a) GENERAL RULE. - The following items shall not be included in gross income and shall be exempt from taxation under this subtitle: (1) BONA FIDE RESIDENT OF FOREIGN COUNTRY. - In the case of an individual citizen of the United States who establishes to the satisfaction of the Secretary or his delegate that he has been a bona fide resident of a foreign country or countries for an uninterrupted period which includes an entire taxable year, amounts received from sources without the United States (except amounts paid by the United States or any agency thereof) which constitute earned income attributable to services performed during such uninterrupted period. The amount excluded under this paragraph for any taxable year shall be computed by applying the special rules contained in subsection (c). ↩
4. Sec. 1.871-2. Determining residence of alien individuals. (b) Residence defined. An alien actually present in the United States who is not a mere transient or sojourner is a resident of the United States for purposes of the income tax. Whether he is a transient is determined by his intentions with regard to the length and nature of his stay. A mere floating intention, indefinite as to time, to return to another country is not sufficient to constitute him a transient. If he lives in the United States and has no definite intention as to his stay, he is a resident. One who comes to the United States for a definite purpose which in its nature may be promptly accomplished is a transient; but, if his purpose is of such a nature that an extended stay may be necessary for its accomplishment, and to that end the alien makes his home temporarily in the United States, he becomes a resident, though it may be his intention at all times to return to his domicile abroad when the purpose for which he came has been consummated or abandoned. An alien whose stay in the United States is limited to a definite period by the immigration laws is not a resident of the United States within the meaning of this section, in the absence of exceptional circumstances. ↩
5. (1) intention of the taxpayer; (2) establishment of his home temporarily in the foreign country for an indefinite period; (3) participation in the activities of his chosen community on social and cultural levels, identification with the daily lives of the people and, in general, assimilation into the foreign environment; (4) physical presence in the foreign country consistent with his employment; (5) nature, extent and reasons for temporary absences from his temporary foreign home; (6) assumption of economic burdens and payment of taxes to the foreign country; (7) status of resident contrasted to that of transient or sojourner; (8) treatment accorded his income tax status by his employer; (9) marital status and residence of his family; (10) nature and duration of his employment; whether his assignment abroad could be promptly accomplished within a definite or specified time; (11) good faith in making his trip abroad; whether for purpose of tax evasion. ↩
6. SEC. 911(c) SPECIAL RULES. - For purposes of computing the amount excludable under subsection (a), the following rules shall apply: * * * (6) TEST OF BONA FIDE RESIDENCE. - A statement by an individual who has earned income from sources within a foreign country to the authorities of that country that he is not a resident of that country, if he is held not subject as a resident of that country to the income tax of that country by its authorities with respect to such earnings, shall be conclusive evidence with respect to such earnings that he is not a bona fide resident of that country for purposes of subsection (a) (1). ↩